Your Honor, the first case on the docket this morning is 2-24-0311. Melissa Ehrenberg, Noshama Ehrenberg, and Dr. Sheva Ehrenberg, plaintiffs' appellant, v. BMO Harris Bank, N.A., is set against a professional personal representative of the estate of William P. Ehrenberg and as trustee of the Karzner Devotable Trustee, April 7th, 1992, defendants' appellant. Arguing on behalf of the appellant, Ms. Jennifer L. Freeland. Arguing on behalf of the appellee, Mr. Michael J. Scott III. Ms. Freeland, you may proceed. Good morning, Your Honors. Good morning, Counsel. May it please the Court, my name is Jennifer Freeland. I represent Shalisha Ehrenberg, Joshanna Ehrenberg, and Betsheva Ehrenberg, who goes by Sheva. And I will collectively be referring to them as the Ehrenberg sisters during the argument today. The Ehrenberg sisters filed suit against their father's estate for an intentional infliction of emotional distress, alleging decades of domestic abuse. Could you tell me why you're only appealing the first count? Because some of the other counts seem to be dependent on the first count. The other counts regarding the direct claim against BMO Harris, is that what you're referring to? Well, there's a 304A finding, and so I went through the complaint trying to determine whether or not, for instance, when you have willful and wanton negligence, those are both considered the same transactional counts, which means that if one still pens in the trial court and the other one is on appeal, there's a question as to whether or not all the claims under 304A are being adjudicated such that it's final and appealable. And so, with that in mind, I was reviewing the other counts, and some of the other counts make reference to count one. I'm not suggesting that they necessarily are pending to the extent that we don't have jurisdiction, but there's at least references to the first count. Now, is it your belief that if you lose this appeal on count one that all the other ones are going to drop, or are the other ones going to continue on? Your Honor, it's my belief that the others would continue on. They were moved to dismiss, and the motion was not granted as to those two counts we've conducted, and we've issued discovery on those counts while this appeal has been pending. Okay. Thank you. As just referred to, we're appealing count one, which is the intentional infliction of emotional distress against William Ehrenberg, which is my client's deceased father. And those inflictions are decades of horrendous abuse, which were very detailed in the complaint, as you know. And then, of course, BMO Harris is defending the estate as its personal representative and its successor trustee. The trial court dismissed those intentional inflection of distress claims in part as time-barred, and also the non-time-barred allegations were dismissed as consisting of Mr. Ehrenberg exercising a legal right in a permissible way. That's with respect to the gravestone. That is the gravestone, and that is also amending his trust, and that is also changing the beneficiary designation to the IRA. So there's three allegations that are post-June 29, 2021, and that is the day that, of course— Do you dispute that, that he was within his rights to do those three acts? I do dispute that he was within his right, and this is the public finance case. It goes to the public finance case, right? And that case was 50 years old, and it has evolved over the years. Could you scoot up a little bit further? Sure. The public finance has evolved over the years into McGrath and into Doe v. City of Calumet. And so while the trial court and BMO Harris found this sort of bright-line rule in terms of that it's a shield, the case is a shield to anything being done in a permissible way, a legal right. That's not the case. I think it's a factor at this point. In fact, in Doe v. City of Calumet, that court examined whether the defendant reasonably believed that his objective was legitimate and said that more latitude is given to a defendant pursuing legitimate objections, not necessarily that they cannot—that a claim for infliction of emotional distress can't be brought against them. And, I mean, let's not forget, we haven't even conducted discovery on this at this point. This is a motion to dismiss. Does the Dead Man's Act apply in this case? So I do think that with regard to what maybe perhaps Mr. Ehrenberg states to the clients, the Dead Man's Act could apply. But, you know, we have—we're not there yet, of course, but we do have other witnesses to this abuse. So I was going to start today with the 2615 piece of the appeal, which is regarding the statute of limitations being June 29th, 2021. And the 2615 is where the trial court had dismissed all of the allegations prior to that. So childhood, early, you know, early adulthood and even adulthood up until June 29th, 2021. And this is the Feltmire case. This is the continuing tort doctrine. And for this continuing tort doctrine allows for the statute of limitations to begin to run on the date of the last injury or the date the last tortious act ceases. BMO Harris argued in the trial court that the continuing tort doctrine didn't apply. And the trial court agreed, finding that the pre-June 29th, 2021 allegations, which spans their entire life, that it was too remote and unrelated to be a continuous tort. And so the trial court called out the allegations we had alleged from 2014 to 2021. And, I mean, essentially, I believe he thought they were just too sparse to contain a continuing tort. And I can go through those facts if you would like today. But my point is, as I stand here today, is that it's really for a jury to decide whether those allegations, of which there are many, are a continuous tort along with the pre-June 29th, 2021. You have to allege something that sufficiently establishes it. And the trial court here said you didn't meet that threshold. So how does that become a jury question? Because I do believe I met that threshold, Your Honor. Can you tell me why? Yes. Feltmeier describes and goes into great detail about the power struggles and authority of an abuser over the victims. And we laid out facts starting from 2014 where my clients did have to distance themselves from their family. But that doesn't mean that a physical distance can't, I found no case law that a physical distance can't mean that an intentional infliction of emotional distress cannot be conducted. Well, if that is true, at what point could a trial court ever find that there is no continuing tort? So, in other words, if you can move to a different country, disavow any contact, it's still continuing tort. Where would we ever draw the line if your premise is correct? Respectfully. Of course. So a tort can happen even, what my point is, they don't have to be in the same town or state or house. That tort can be inflicted from afar. And in this case, it was inflicted by not allowing my clients to see their mother for many years. When they would call the mother, who was also abused by the father, they were not allowed to speak to her directly without him being present. When one of my clients, Joshanna, had called about an unfortunate miscarriage she had had, wanted to talk to her mother, her father told her mother to hang up the phone, and he did, she did. On her mother's deathbed, Joshanna wanted to tell her that she loved her, and Mr. Ehrenberg had considered it for a moment to toy with her and then said, I don't think so, and hung up, and she couldn't say goodbye to her mother. He didn't tell them that their mother was sick and on her deathbed. They find out things through other family members. When their mother passed away, he did not tell them. They found out, and they didn't find out in time to go to any funeral service. It was July of 2020, and he wouldn't allow a Zoom funeral service or a shiva so that they could mourn their mother with their family. On his own deathbed, he amended trust, his trust, and what that did was they have no access to any of their mother's belongings. There's no way for them to grieve their mother. So he knew, I mean, the point is that he knew that was going to be very painful to them, and he knew that putting beloved mother, I'm sorry, beloved wife on the gravestone without any reference would be painful to them. Does he have the right to do those things outside of the fact that he was intentionally inflicting emotional distress? Of course he does, yes, and he can amend his trust, and people can do that. But these are very, very unusual sets of facts that we have here. And those actions, my clients allege, and a jury could find are tortious. They are inflictions of emotional distress directed at his daughters. I'm willing to entertain that because of alleged abuse and the family setting, that something that might not seem as egregious could be viewed as hurtful or could cause extreme distress. But don't the acts in and of themselves have to be outrageous? And I guess my concern is that, because there's some strong language in Feltmire, but there's really, within that period of time, June 29, 2021, there's really very little. He amends his will, he dies, changed the IRA, the gravestone had been done previously. We don't know when the gravestone had been done. Well, it was around the time of their mother's death, right? Yes, so it would have been prior. Mom died around July 26, 2020. This is what my notes say. But without discovery, we don't know when it was actually, you know. Well, let's assume that was during the period, the period two years before the complainer, so that Judge Smith identified as being within the statute. My concern is whether or not those acts are outrageous enough, even in context, even with some context. You know, do you think that's important or do we, otherwise it's kind of hard to look at the whole scope of the alleged abuse. And say that it's a continuous tort. Maybe this is another comment I'm making. If you want to address it, that's fine. But there's that long break there where the contact isn't frequent, the daughters have grown up, they have their own lives, contact is very limited. How do we view that as one continuing tort? So I guess those are two probably confusingly stated questions. I do think I understand that, too. And I'll address the second first, is how is that a continuing tort with so little contact? I do think it's a continuing tort. There's no contact because of his abuse, right? So it's a continuing abuse because they lost their parents. They had to move away from their mother. They did not want to do that. They were forced by their father to, their father inflicted emotional distress on them continuously by not allowing them to have any relationship with their mother. And then while it is a longer period of time, there are instances during that period of time where they attempted to reach out and they were blocked and hung up upon. He called them menacingly, Shiva. You know, there were instances of contact. And Feltmire, I believe, is applicable here in terms of this continuing tort doctrine, right? Because you're not, the way that I read Feltmire and the way Feltmire, I believe, should be read, is that you're not looking at every single, you know, action because each one action in itself may not be outrageous or extreme. But in the context of the whole, then they, you know, they are. If you look at the whole power dynamic and the whole relationship that they have had. I was going to make reference to the Pavlik case, but I can. Well, any other questions? No. No, I don't at this point. Do we want to hear further arguments? Yes. Will you finish up with what you thought you were going to get to? Yes. The Pavlik case is Pavlik v. Kornhaber. And this is a case that is an employer therapist that inflicted, was found to have inflicted repeated sexual misconduct on a plaintiff. Actually, his complaint survived. I shouldn't say that was actually found. The reason I'm bringing this one up is the final acts of intentional infliction of emotional distress. In that case, there's discussion in there how, on their own, there are letters written to the victim that, on their own, they were probably not outrageous enough. And this reminded me of the trust amendment in the IRA and the gravestone. But the court in Pavlik did find that it was a continuous tort of intentional. It was a much shorter period of time. Significantly shorter. It was July 94 to November 94, so I agree. Like months. Yes. Where here we're talking years and years, right? That's right. But I think that the premise still does apply, that, you know, there isn't case law out there that says that this type of infliction can't be more than X number of years or can't be a person's whole life. We don't have that case law at this point. Thank you. What's the benchmark? The determiner is whether a reasonable mind, no reasonable mind would agree with the premise or the conclusion. The benchmark that, like what is the standard of measurement for what is too much or too little? Too much or too little infliction or time?  No, I don't think there is. I think it's for a jury to. Well, you said the premise was applicable. So my point is the, and I'm not sure necessarily that it's a premise so much as it's a conclusion, but everything must come to an end. Even the universe supposedly will in the last seven minutes turn colder than zero Kelvin. And so I'm asking you to reduce it, reducia ad absurdum, to reduce it to absurdity and tell me when you think the limitation is reached. Well, I think the limitation is reached when the infliction ends. When what? When the tort ends, when the infliction ends. And in this case, it ended when he died. So assuming we're in relative agreement relative to the definition of death, this would continue on until the defendant father dies? You know, I'm making that assumption based on these facts and what I know about these relationships. The last infliction that I know of would have been the, I think it was the, two days before his death on August 13, 2021 is when he changed the IRA beneficiaries. Okay, any other questions? No, thank you. Thank you. We'll have an opportunity to make rebuttal. Thanks. Mr. Scotty, is that how you pronounce your name? It's pronounced Scotty. It is? Yes, sir. Do you know that the Scots were named the Scotty as a tribe by the Roman legions when they occupied Britannia? As a matter of fact, I do. My dad did some research into that. And even though we're Italian by last name, if you, on my 23 and me, it shows that I'm 48 percent Irish. Well, that's where the Scots came from. They came from Del Raiata, or I should say they came from Northern Ireland and around 1000 formed a kingdom called Del Raiata. But it's interesting. So you're Irish rather than Scottish? No, my family heritage is Italian, but my DNA says that I'm Irish. I see. Because the Northern Italians came back from the Roman Wars to settle in that area. Okay. Thank you. You may proceed with something other than genealogy. I appreciate that. May it please the Court opposing counsel, the Circuit Court and Judge Smith made a proper order when it dismissed the amended complaint count one based on both a failure to state a claim and based on statute of limitations. There's no dispute that there's a two-year statute of limitation. There's no dispute what the elements of the claims are. In fact, the first is it requires extreme and outrageous conduct. And the Feltmire case does it so eloquently. I'm going to read from that case. The Supreme Court opinion? The Supreme Court opinion in Feltmire in 2003, the case that is relied upon heavily by the plaintiffs in this action to advance their continuing tort theory. It reads, rather the nature of defendant's conduct must be so extreme as to go beyond all possible bounds of decency and to be regarded as an intolerable in a civilized community. That's a very high bar. The emotional distress tort is relatively new among torts. It was entered into in the 1940s or 50s. And the Illinois courts adopted decisions from other states and made the bar high because they didn't want frivolous claims. They wanted severe conduct and severe emotional distress. In this particular case, the facts that are alleged in the complaint, I divide them into three categories. I go to their early childhood where let's take that all the way up until they reach 20 years of age when they're living in the same house as their father and mother. And that's when all the detail in the complaint is. Let's assume for argument that they stayed a cause of action then. And then you have their young adult years from the 20s all the way up until their 40s. And during that period of time, there was very little conduct, almost no contact by the father to them. It's them reaching out to the father. They admitted, they alleged in their complaint, which they verified that they estranged themselves from their father. And in their briefs, they argued that they lost their mother as a result of that estrangement. And as adults, they made that decision in I think it was around 2013 or 2014. And by the time they filed the complaint, the oldest daughter was 49, the middle daughter was 46, and the youngest daughter was 43. And we have to remember these are three separate plaintiffs. When opposing counsel was making her argument, she said she was going to refer to the sisters collectively. Well, that's not the way the pleading standard is. Each sister has to have their own claims. For example, the oldest daughter in the allegations, it doesn't allege any contact with the father from 2014 on for that individual. The last contact where anybody ever saw their father was in 2019. It was an allegation at the Willard Hotel in downtown Washington, D.C., where the father brought the mother, Christine, where they traveled together to meet with the younger two daughters. And there were no words exchanged between the father and the daughters. There was just a smirk, which I don't know how you tell the difference between a smirk and a smile. And based on that, they made some conclusory allegations. But all the conduct in that period from 2014 up to the time he died, there's nothing in there that rises to the level of outrageous and extreme conduct. They allege that he sent them an email in 2017, which invited them very politely to ask their mother and him if they had questions about their family or their lineage or their history because they regret not having the opportunity to ask their own parents that. And instead of seeing that as a gesture of kindness, they interpret that as another contact of this abuse. And that's clearly not extreme or outrageous conduct. May I ask, my notes indicate, and so they might be wrong, but March 2017, it's alleged that the dad led the sisters to believe the mother was dying, but that was not true. Would that possibly, with or without context, would that qualify as extreme and outrageous? What's your take on that? My take on that is that their allegations are conflicting. They have allegations that say she was suffering from mental health issues. They have allegations that she was dying and they found out from relatives. I don't think in a motion to dismiss we're necessarily going to look at the conflicting allegations, are we? Well, some people can, they have so many. Should we take the gist of it and then decide if we think the case has merit? It's really, we judge the allegations as they are, don't we? We do, but when they have conflicting allegations, you can plead yourself out of a claim. For example, if you have one allegation that's inconsistent with another, but without putting too much emphasis on that argument, let me direct your question. No, I don't believe that is sufficient information. If you assume that he led his daughters to believe. I said extreme and outrageous. Yeah, I don't believe it is extreme and outrageous, and it's one act. It's one act. That doesn't, for the continuing tort document, that doesn't allow, we did that in 2017 to connect that with activity that happened when they were, in 2010 and 2011, when they were living under his home. There's a power structure here that they raise in their complaint that they say that people in power, and they get this from the McGrath case, and it's mentioned in other cases too, should be judged more harshly. But in this particular case, the father had no power over his daughters. Nowhere is it alleged that he had power, at least after 2014. He was not a lender, like in the McGrath case. He was not a police officer, like with the power of government under the Calumet City case. He was not a spouse living under the same house as in the Feltmire case. In the Feltmire case. I would concede that, I guess, and I don't mean to spar with you on it, but they allege that he prevented them from having a relationship with their mother, who, according to the allegations in the complaint, they, you know, loved. And so that telling the sisters, or leading the sisters, is what I wrote down. I don't know how it was communicated. Leading the sisters to believe the mother was dying, but it wasn't true, and keeping them from him. That may add some context. He didn't keep them from them. They allege that he brought the mother. They call it the activity. They allege that he brought the mother so they could have two hours of uninterrupted meeting at the Willis Hotel. And remember, the mother was in a mansion. In November 2019. Correct. A year before she passed away. And those acts are not extreme and outrageous. They just don't rise to that standard. And they are completely unrelated to the acts that happened within two years of filing the complaint, the statute of limitations. The acts that are involved there are he amended a trust document to move the family home into the trust. And the beneficiary of the trust are charities. The state of Illinois encourages people to give money to charity. There's nothing improper about that. He's exercising a legal right. And in their briefs, they admit that these are all legal rights. And the next was on an IRA beneficiary form, he checked to change the beneficiary to the trust. And on the tombstone, he put beloved wife. There's nothing extreme or outrageous about those acts within two years of within the statute of limitations that act as an anchor for all these other claims. For example, with the mother, she passed away in July of 2020. So if they had a claim based on the mother, they should have brought the claim within two years of their mother dying. They complained that he didn't give them enough notice to travel. But the allegation itself assumes that they knew that there was a service before the service happened. So there just aren't any torts within the statute of limitations to allow the continuing tort doctrine to apply. Even the name the continuing tort doctrine applies. There must be torts. In the Pavelchuk case, which she cited, it was a very close period of time where a supervisor and his employee engaged in sexual conduct, inappropriate relations. He had lied about his credentials because he was going to be her mentor. And then shortly after that stopped, he sent a couple of letters, again, encouraging her to date him and have sexual contact. And those two letters in and of themselves may not have been actionable, but if you take the accounts where she was rejecting him for months before, in the totality over that very short period of time, the continuing tort document could apply. In the Feltmire case, where you had actions that happened throughout a marriage of physical abuse, restraining the wife from leaving so others couldn't see her bruises, stalking her. And then after the divorce, he continued to stalk her, even broke into her office at work and locked her and stole her computer. And the continuing tort doctrine was applied there. There was no case in the history of Illinois or any other states that cited in these briefs that has acts 10, 15 years later where the continuing tort doctrine applies. Just imagine the floodgates, and I know the floodgates argument is overused, but imagine you drafting an opinion in this case which doesn't open the floodgates for every estranged relative, son, daughter that feels like they've been slighted by the estate documents, planning documents of their parents. I mean, what if Mr. Aaron Berg had left them each $100,000 instead of leaving all his money to charity? Would that eliminate those acts from being an intentional infliction? What if he left them a million? How much is enough before changing your will is not an outrageous act? It just is incomprehensible to me, representing a bank which serves as the trustee and executor of the states, that they should open themselves up to liability every single time a child feels like they're not getting what's coming to them. There's no allegation. And he did these things in private by himself. He didn't taunt his kids. He didn't manipulate his kids with money. He didn't hold it over them. He didn't make them do things in the hope, and they certainly had no expectation. Were they financially dependent on him? They were not. There's no allegation that they were financially dependent on him. They were estranged. There's no allegation that he gave them money, that he loaned them money, that he made them do things for money, none whatsoever. And so he did these things in private. And in the public finance case, the court set out a two-part test to evaluate whether or not acts could be shielded from an intentional infliction of emotional distress. Do they have a legally permissible right? And in this case, everybody agrees they did. And then the second part is, did they exercise it in a legally permissible way? And I would argue he did that. The one case where they found out that wasn't the case is in McGrath when it was a finance and a lending situation where they had contracts, but the defendants were alleged to have acted in a way wholly unjustifiable by the contract. So it was not legally permissible. And, in fact, they said it was tantamount to extortion. So in those situations, yes, they had a legal right to do things, but they didn't exercise their right in a legally permissible way. There's no allegation in the complaint, no factual allegation, and no case law that can link up the actions within two years of filing the complaint to the other allegations of extreme and outrageous conduct in the complaint. Well, it seems like your argument is that not only must there be outrageous conduct, but there needs to be outrageous conduct based upon a wrongful act or a tort. For the continuing tort doctrine to apply, there has to be an act of outrageous and extreme conduct that took place within the statute of limitations to allow the events that are connected with it to continue the tort. The Feltmire case, which sets out the law very well in this, essentially had two quotes, and one was it said, however, under the continuing tort or continuing violation rule, where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date of the tortious acts cease. So what was the date that the tortious acts ceased? I'm not discussing continuation for purposes of getting around the statute of limitations. I'm talking about the basic premise or the basic perspective of what constitutes the tort of intentional inflection of mental distress. And to my knowledge, it's always been based upon some classical concept of a tort. Negligence, willful and want conduct, or something like that that is so outrageous that it causes not physical harm to the plaintiff, but causes them emotional harm. And to me, the classic one is where the child is mangled by an escalator in the presence of the parents. The parents weren't mangled, but they sure were mangled emotionally. And so the point is that there has to be an underlying tort that results in a mental injury or an emotional injury. So in answering your question, I agree that there has to be an underlying tort, and the tort has to amount to extreme or outrageous conduct. As a matter of fact, there's a case, and it's cited in my brief, and I just can't remember which one it was, but the court said that there are, to become, it's possible you could have acts that qualify for punitive damages under regular torts, but still wouldn't be enough of extreme or outrageous conduct to go over the bar for intentional inflection of emotional distress. It's a very unique claim. It's a very high bar, and the plaintiffs haven't met it. So I would request that you affirm the circuit court's orders dismissing the case on both, based on the statute of limitations being a bar and failing the state cause of action. Any other questions? No, sir. Thank you, sir. Thank you. Ms. Friedland, you may proceed. Mr. Scotty had a lot to say about his version of the facts, his argument involving the facts, and assumptions that he made about the facts that my clients alleged, and that's not what we're here for. We're here because our facts are supposed to be considered as true, and then determined whether they constitute a claim. The floodgates argument is one that does not concern me as much as it does Mr. Scotty. I do believe that these are very, very extreme facts that your typical child who is slighted is nowhere near going to be able to allege. And Feldmeyer actually addressed this floodgate concern as well. And this is in the Supreme Court, Feldmeyer case, 207, Illinois 2nd, 263. And it was addressed on page 271 and 272, saying, However, we believe that the showing required of a plaintiff in order to recover damages for intentional inflection of emotional distress provides a built-in safeguard against excessive and frivolous litigation. As the appellate court herein stated, when conduct is truly extreme and outrageous, it is more likely that severe emotional distress suffered by the victim was actually caused by that conduct. There were inflections of emotional distress from 2014 to 2019, and through the final inflection, August 13th of 2021. A jury could do with argument that we should address not the sisters, but each individual. We did experience different things. So I do agree with that. However, during that period of time of 2014 and 2019, we had alleged, and I can find the paragraph, that Joshanna was sort of appointed by the three sisters as, I suppose, like an agent to, Could you please call mom and dad? Could you please find out what's going on with mom? You know, could you, you know, see if they'll do family therapy with us? And he said, why? And she said, because we were abused. And he laughed and hung up. She was representing all three sisters during that time as she was attempting to build a bridge to her parents, and especially her mother. So, you know, I think that's very factual in terms of who it applies to. I do agree that it may not apply to each and every one in each instance. But I also think that Feltmire is so important here in terms of domestic abuse and the domestic abuse of all three of these now women, abused as girls and women. And it's a continuing tort. It's not just what happened to Batsheva on this day and Joshanna on this day and mom on this day. It is abuse that they suffered psychologically, physically, and emotionally for many years of their lives. Unless you have questions, that's what I have. I have no additional questions. How are you going to establish that the acts relating to the formulation or amendment to the defendant's estate was done improperly if no one is allowed to testify about conversations had with the decedent? Other people can testify other than my clients regarding those conversations, I believe. Neutral individuals can testify about his intentions with regard to those transactions.  Yes. About conversations? I believe so, yes. Okay. What conversations would those be where he would say something that would indicate that this was malevolent insofar as giving money to charity or disinheriting children, which I believe is allowed? I also believe it's allowed. Your Honor, the personal belongings of their mother I think is particularly what was inflicting emotional distress on them. To this day, they haven't been back in that house. The house is sitting there. And to answer your former question, there are family friends and family members who are not benefiting from this estate who were in communications with Mr. Ehrenberg during that time. We haven't conducted discovery on this yet, but according to my clients... I guess what we're driving at is the Dead Man's Act. Well, the Dead Man's Act you can testify so long as you don't have an interest in the estate. I'm not sure that's the law. My understanding of it is you can't testify relating to a conversation of a decedent unless there's a waiver by the estate or the representative of the decedent. Because the idea conceptually is this person is dead. They are not being given the opportunity to testify counter to whatever it was that this disinterested witness testified they said. And so it's supposed to be used as a shield, not as a sword. But the kicker is that I'm not aware of the exception that you've cited as being disinterested. There may be more esoteric analyses where the party was a disinterested third party and possibly there was an excited utterance, say an auto accident or something like that. But even if you sustain the opportunity to try the case, I don't know... To me, you have a very difficult impediment standing in your way. And so that's just an observation. Any other questions? Thank you. We will take the case under advisement. There are other cases on the call.